247 P.2d 178

**SNIDER et ux. v. TOWN OF SILVER CITY**
**(Merriman, third party defendant).**

No. 5399.

Supreme Court of New Mexico.

Aug. 4, 1952.

Royall & Royall, Woodbury, Shantz & Woodbury, Silver City, for appellant.

Hubert O. Robertson, J. R. Wrinkle, Silver City, for appellees.

SADLER, Justice.

The Town of Silver City, a municipal corporation, complains before us of a judgment rendered against it by the district court of Grant County in the sum of $7,640 in favor of the plaintiffs (appellees) by reason of property damage found to have been sustained by them in a gas explosion which destroyed certain auto cabins and items of personal property described in the complaint. The trial was before the court without a jury and the defendant Town feeling aggrieved by the judgment prosecutes this appeal.

On the 15th of March, 1949, the Town of Silver City had a crew of workmen engaged in digging a trench for laying a sewer line north on Canal Street within the corporate limits of the town. The line for the trench carried it some fifteen feet west of a tier of auto cabins owned and operated by plaintiffs. Gas and water lines

already were located in Canal Street. In the course of the operation the power driven trenching machine being used to dig the trench, called a "drag hoe," snagged the gas pipe line and bent it at the point of contact resulting in a break at a 45° elbow under the west foundation of the center cabin of the three involved, which had been constructed and were being operated by the plaintiffs.

In the explosion which followed the break in the gas line, the occupant of the middle or center cabin in the tier of three was killed. A suit for damages followed which was compromised in the course of trial and an agreed judgment for $7,500 entered against the Town of Silver City, the defendant in the present action. The suit mentioned was by J. D. Merriman, as administrator of the estate of Bernal Hellier, deceased, as plaintiff, against the Town of Silver City, as defendant, which appeared also as a third party plaintiff by impleading as third party defendants one of the present plaintiffs, Lillian M. Snider and the heirs of Bert M. Snider, who prior to his decease, was also plaintiff in the present cause. As in that action the Town of Silver City is the principal defendant in the present suit, the original plaintiffs being Bert M. Snider and Lillian M. Snider, his wife. In the present action, the Town of Silver City appears also as a third party plaintiff by impleading J. D. Merriman, as administrator of the estate of Bernal Hellier, deceased, as a third party defendant and prays recovery over against such defendant of one-half of the damages, if any, awarded against it, just as in other action, as a third party plaintiff, it had asked recovery over against the Sniders as third party defendants of one-half the amount of any damages awarded against the town as the primary defendant. The two suits were numbered 12,194 and 12,195, respectively, on the civil docket of the district court of Grant County, the one bearing the lower docket number being the one in which an agreed judgment based on a compromise was entered.

While the crew of workmen operating the trench digging machine were working in close proximity to plaintiffs' cabins and between 10 and 10:30 o'clock in the forenoon of the date mentioned above the machine snagged the gas pipe line, pulling and bending it and jerking a portion thereof from the ground. Immediately thereafter the gas pressure in each of the two end cabins of the tier was noticeably reduced and the odor of escaping gas could be detected outside the cabins in the vicinity where defendant's servants and employees were working. The occupants of two of the cabins discussed the lack of gas pressure in the cabins occupied by them in a tone of voice sufficiently loud for such employees to hear the conversation. Shortly thereafter one of defendant's employees in the presence of other workmen

struck a match and held it down near the pipe line where it was exposed by the snagging at a point nearest the cabins. Immediately a flash of fire was caused by the escaping gas. It was put out by one of the workmen throwing dirt on it. Notwithstanding the foregoing evidences of a leak or break in the line, nothing was done by any of the defendant's employees to prevent the escape of gas or to locate the leak in the pipe line. Soon, thereafter, all members of the work crew left for lunch without having notified the gas company of the possible leak or break in the gas line and without having done anything to prevent the escape of gas, or to locate the exact point of leakage.

The foreman in charge of the ditch digging crew was the gas inspector for the Town of Silver City and was present both before and after the snagging and bending of the gas pipe line by the drag hoe. At least two or three of the defendant's agents and employees, one of whom was the gas inspector, who were present at the scene of the snagging and jerking of the gas pipe line had had experience with natural gas and knew of its dangerous properties. On former occasions, when an occurrence like this took place, the employees engaged on the job had made it a practice to call the gas company so that an immediate investigation could be made to determine if there were leaks and with a view of repairing any found. The highly dangerous, elusive and explosive nature of natural gas and the great care required in order to manage and control it safely were facts well known to the defendant, its agents and employees. Notwithstanding this, however, after the snagging of the gas pipe line and with knowledge that gas was escaping as shown by the flash fire mentioned, the defendant failed to notify the gas company or take any other precautions to stop the escape of gas or determine the location of the leak.

Subsequent investigation disclosed that a break had occurred in the gas line beneath the foundation of the center cabin of the tier of cabins through which gas was escaping and accumulating in large quantities in the two north cabins of the teir, all without the knowledge of plaintiffs. About 12:30 o'clock, shortly after noon on March 15, 1949, the accumulated gas became ignited without the fault of plaintiff resulting in a violent explosion and fire in the tier of cabins mentioned, almost completely demolishing the two north cabins and resulting in extensive damage to the north wall of the south cabin.

The trial court awarded damages in the total sum of $7640 made up of items as follows:

Reasonable cost of replacing or
   restoring the two north cabins $4500.00
Reasonable cost of restoring the
   north wall of the south cabin.. 1000.00

Reasonable value of personal property destroyed, and not covered by insurance consisting of one stove at $25.00, chest of drawers at $15.00 and miscellaneous articles at $55.79 . . . . . . $ 95.79

Cost of rerouting and repairing plaintiffs' gas pipeline necessitated by explosion . . . . . . . . . . . . . 444.21

Loss of rental income otherwise accruing between March 15, 1949 and July 15, 1950, from cabins destroyed and resulting approximately from the explosion . . . . . . . . . . . . . . . . . . . . . . 1600.00

The tier of cabins destroyed or damaged was erected on Canal Street due to a misapprehension on plaintiffs' part as to where their property lines ended. This misapprehension seemingly was shared by defendant Town to the extent, at least, that it accepted certain taxes from plaintiffs on the cabins so located. At some time prior to the date of the explosion the defendant acquired knowledge that plaintiffs' cabins were wholly on Canal Street, its property. Its act in striking and snagging the gas pipe line as aforesaid violated a duty of proper care owed by the defendant to the plaintiffs and the damage suffered by them resulted from a violation of this duty by the defendant.

The foregoing constitutes a narration of pertinent facts found by the trial court.

It concluded from them that defendant's failure to take preventive action definitely to locate the leak or break in the gas line constituted willful and wanton negligence, more especially in view of the grave consequences likely to follow such failure. The court concluded further that all of the damages suffered by plaintiffs resulted directly and proximately from defendant's negligent acts for which they were entitled to recover. Judgment based on the foregoing findings and conclusions having been entered for the amount above stated, the matter comes before us by appeal for its revision and correction because of errors claimed to have been committed below and assigned here as grounds for reversal.

The first and basic decision to make in a consideration of this appeal is to determine the question of liability vel non on the part of the defendant, Town of Silver City. If there be no liability at all that ends the matter, the judgment is erroneous and it should be reversed. If there is liability then additional questions reserved below for review here emerge and must be resolved. There can be no doubt but that counsel for the defendant have reserved for review the primary question of liability. Accordingly, we shall proceed first to resolve it. In doing so we must cut away a tangle of legal undergrowth with which the basic question has

been surrounded in argument before reaching it for solution.

To illustrate and as pointed out above, it is an admitted fact in this case and the trial court found that plaintiffs' cabins, for loss of, or damage to, which this action was filed, were constructed wholly on land belonging to defendant, namely, on Canal Street. Thus the plaintiffs were trespassers or licensees, at best. As such, the Town was liable to them only for wanton or willful negligence. Chavez v. Torlina, 15 N.M. 53, 99 P. 690. See, also, Jones v. George F. Getty Oil Co., 10 Cir., 92 F.2d 255.

■ Nevertheless, we are asked to determine if there be error in the trial court's ruling below that the judgment in the Hellier case, Cause No. 12194 on the civil docket of the district court of Grant County, is res adjudicata as to the question of actionable ordinary negligence on the part of defendant and of contributory negligence on the part of the plaintiffs. The trial court's ruling left open for determination in this case touching defendant's liability only an issue of wanton and willful negligence on the part of the defendant and, if found to exist, whether that negligence is neutralized as a basis for recovery by like conduct on the part of plaintiffs. See Gray v. Esslinger, 46 N.M. 421, 130 P.2d 24, and opinion on second motion for rehearing, 46 N.M. 492, 131 P.2d 981.

Two considerations suggest the harmless character of the ruling on the question of res adjudicata. In the first place, can there be any doubt that negligence so aggravated as to be wanton and willful of necessity embraces actionable, ordinary negligence, the kind or type as to which the decree in the former action was held by the trial court to be res adjudicata? We think not. In the second place, or perhaps more accurately stated, the plaintiffs had at most but a pyrrhic victory in securing the ruling they did on the issue of res adjudicata. The initial step in proving the type of negligence reserved for proof, namely, negligence to a degree that would characterize it as "aggravated," "wanton," or "willful" would be to supply proof of the kind which the trial court held they could take for granted under the doctrine of res adjudicata. So we see no purpose in deciding the phantom issue of res adjudicata. Hence, we shall proceed forthwith to resolve the question of liability, employing as a test the decisive consideration of whether there was adequate proof of wanton or willful negligence by both or either party.

■ We think there can be no doubt on the question of the evidence supporting a finding of willful and wanton negligence on defendant's part. The testimony showed it was usual to locate a gas pipe line as a pick and shovel job instead of employing the overwhelming force of mo-

tor driven machinery. But having done the latter and with knowledge that a break had occurred as shown by the flash fire started on the striking of a match, then to drop shovels and equipment, shut down the job and take off to lunch with escaping gas in such proximity to living quarters of occupants of the cabins as to render it not only likely but almost certain death or serious injury would soon take place from explosions or asphyxiation, discloses such callous indifference to consequences as fully to support the trial court's finding that there was wanton and willful negligence by the servants and agents of the defendants chargeable to it.

There was evidence that the defendant's employees knew of the leak or break; that they knew of the dangerous properties of gas and the great caution required in handling it; that they knew the cabins, or at least two of them, were occupied; that a bend in pipe will necessarily strain or break it and that the bend in this pipe was exposed at once as it was jerked from the ground. Yet, as the evidence also discloses, the employees left for lunch without discovering or making a serious effort to discover and mend the break or leak.

The defendant says, however, that the trial court did not find wanton or willful negligence on defendant's part, the only point at which those terms are used being in the conclusions of law. We disagree with this claim. True enough, the actual terms "wanton" and "willful" are not used in the findings but acts and omissions amounting to that degree of negligence are found in these findings of fact, to-wit:

"5. That the defendant, through its agent, servants and employees knew of the approximate location of a natural gas pipe line that was used to convey gas to said tier of three cabins owned by plaintiffs.

"6. That defendant, through and by its agent, servants and employees, knew that said cabins were used as living quarters for persons and on March 15, 1949, defendant's said servants, employees and agents saw persons occupying each of the two end cabins of said tier, in and about these cabins.

"7. That about 10:00 a. m. to 10:30 a. m. on said date, while digging said sewer line, with the power trenching machine, the defendant, did carelessly and negligently snag and catch the said gas pipe line, pulling and bending it and jerking a part thereof from the ground.

"8. That immediately after said jerking and bending of the said gas pipe line as aforesaid, the gas pressure was noticeably reduced in each of the end cabins of the said tier of cabins.

"9. That after the jerking and snagging of said gas pipe line, the odor of escaping gas was noticeable outside the cabins and in the vicinity of where defendant's servants, employees and agents were working; that the occupants of the two cabins discussed the lack of gas pressure in the presence of defendant's servants and employees, in a tone sufficiently loud for said employees to hear the conversation.

"10. That one of the defendant's agents, servants and employees in the presence of other of its agents and employees struck a match and held the same to the said pipe line at a point where it protruded from the ground nearest the said cabins and there was sufficient gas escaping along the pipe line to ignite and cause flash of fire.

"11. That after the flash of fire from the ignition of escaping gas, defendant through its servants, agents and employees did nothing to prevent the escape of gas or locate the leak in the said gas pipe line and left the premises for lunch without having acted to prevent the escape of gas from the pipe line or to locate the exact point of leakage.

"12. That after snagging, catching and breaking said gas line, defendant had knowledge of the danger to plaintiffs' property and knowingly failed to take action to locate the break in the gas pipe line and leakage of gas, *and in reckless disregard of the consequences of said break or leak left the premises without taking any corrective action or informing plaintiffs of such leakage.*

"13. That the person in charge of the sewer ditch digging crew and present both before and after the catching and bending of said gas pipe line by the power trenching machine, was the gas inspector for the Town of Silver City.

"14. That at least two or three of defendant's agents, servants and employees including the gas inspector, at the scene of the snagging and jerking said gas pipe line had experience with and knowledge of the dangerous properties of natural gas; that on previous occasions when gas pipe lines had been snagged and caught by the power trenching machine, the company selling and distributing natural gas had been called by the sewer ditch digging crew to immediately investigate the same to determine if there were leaks and if so repair same.

"15. That natural gas is of a highly dangerous, penetrating, elusive, and explosive nature, requires great care

and caution to control and manage safely, all of which was well known to defendant, its said agents, servants and employees.

"16. That after the snagging of the gas pipe line and after the flash fire caused by the ignition of escaping gas, defendant failed to notify said gas company or take any precautions whatsoever to prevent the escape of natural gas from the gas pipe line or to determine the location of the leak.

"17. That a break at the point was caused in said gas pipe line beneath the foundation of the middle cabin of said tier of cabins by the negligent snagging and jerking of said pipe by defendant's agents and employees." (Emphasis added.)

The findings set out above disclose wanton and willful negligence by defendant's agents and employees and support the trial court's conclusions of law Nos. 1 and 2, as follows:

"1. That the negligence of the defendant was active negligence by an affirmative act.

"2. That the defendant's failure to take any preventive action to definitely locate the leak of gas or the break in the gas pipe line in disregard of the consequences constituted willful and wanton negligence."

The only effort by the defendant to counteract this finding of willful and wanton negligence on its part is to insist that its own negligence, whatever its degree, is met and neutralized by negligence of the same character and aggravation on the part of plaintiffs, thereby barring recovery by them within the rule approved by us in Gray v. Esslinger, supra. In other words, say counsel for defendant, if our client's conduct at the time was of an aggravated character, so was that of the plaintiffs. We have carefully examined the testimony of acts and omissions on the part of plaintiffs relied upon to show wanton and willful negligence and we are satisfied they fall far short of showing negligence of that character. The fact that in response to a request by foreman of the work crew she endeavored to give them the approximate location of the gas line is one of the things insisted upon as showing such negligence. Fairly appraised by the trial judge, however, he must have believed the most she did was to give the approximate location of the gas and water line, stating at the time she did not know which they would encounter first, the pipe line for the gas or for the water.

It is also claimed she should have notified the sleeping occupant of the center cabin of danger and that she should have ordered her plumber to cut off the gas, upon becoming apprised of a leak. None

of these omissions, if negligence, take on a character of wantonness or willfulness, more especially since so to hold would have imputed to her greater knowledge of the extent of danger than as a laywoman she likely possessed. The trial court properly declined to convict plaintiffs of wanton and willful negligence.

■ Finally, we come to the question of damages. The parties are in violent disagreement as to what is the proper measure of damages to apply for loss or destruction of the cabins. The defendant insists that in as much as plaintiffs had in the cabins merely the limited right of removal, the only recovery they can have is the damage to this right. This, counsel for defendant say is a very hazy interest in the cabins, amounting to little more, if anything, than their salvage value. Counsel for the plaintiffs on the other hand give it as their understanding that the "proper measure of damages is the cost of restoring the cabins to the sound and safe condition they were in at the time of damage." That the question is not free from difficulty is disclosed by the following quotation from 25 C.J.S., Damages, § 85, pp 608–609, to-wit:

"While primarily the amount of recovery for the injury to destruction of a building is the amount of the loss, no hard and fast rule can be laid down for all cases as to the measure of damages. There is some variance in the authorities as to the correct measure of damages, due in part to a variance of opinion as to whether the building is to be considered in connection with the land on which it is placed, or as distinct therefrom. * * * On the other hand, sometimes on the theory that buildings have a value apart from the realty on which they stand, it has also been held, particularly where the buildings are destroyed without other injury to the freehold, that the value of the buildings destroyed is to be taken as a measure of damages. In some jurisdictions this rule has been applied where the action is brought for injury to buildings as apart from the realty, although the rule first stated, based on diminution of the value of the real estate, is also recognized. * * * Where the building can be restored to substantially the condition it was in prior to the injury, * * * the measure of damages may be the cost of restoration, together, in a proper case, with the loss of rental, * * *."

In 15 Am.Jur. 523, § 113, "Damages," the author of the text states:

"In some jurisdictions, if a destroyed building can be replaced in substantially the same condition in which it existed before its destruction,

the measure of damages is the reasonable cost of replacing it. It has frequently been held that the measure of damages for injury to a building which is not destroyed is a sum sufficient to restore it to substantially the condition it was in prior to the injury where this can be done at a reasonable cost or for less than the depreciation in the value of the building as a result of the injury."

We think the plaintiffs have suggested the appropriate measure of damages in the unusual situation here confronting us. It truly would be a harsh rule to confine plaintiffs to the mere salvage value of the cabins destroyed immediately prior to the explosion. True enough they were mere trespassers or licensees. Nevertheless, as such they had been in the quiet use and enjoyment of the cabins for an appreciable period as an income producing property and but for the unexpected and certainly avoidable explosion might have so continued for an indeterminate period in the future.

The mere fact that they cannot rebuild and, as for that matter, had been enjoined by the defendant from doing so by a formal written termination of the license to remain, should not alter the fact that the buildings as they stood immediately prior to the explosion had a demonstrable and provable value which was wiped out by the explosion. For any number of good reasons, a plaintiff recovering damages using the present yardstick urged by plaintiffs as their measure where not debarred from restoring or rebuilding, as in the instant case, might conclude it inadvisable to do so. We think the trial court did not err in employing the measure of damages it did and that there is adequate proof to support the award of $4500 for loss of buildings.

Nevertheless, we think the trial court expanded the measure of damages unduly when in addition to the cost of restoring the destroyed cabins it awarded an item of $100 per month as reasonable rental value of the cabins from date of explosion down to the date of judgment, or a total of $1600. This is nothing more than a claim for loss of profits in the operation of the cabins and imports into the measure of damages employed a new and different factor.

The plaintiffs themselves had recognized for some time the tenuous character of their occupancy of a part of Canal Street with these cabins. They were there without right and cannot predicate an award of damages on earnings from buildings which they neither could restore nor reconstruct and which, even if they might have done so, there was not the slightest probability they would, because of the known insecurity of their tenure as occupants. But as-

suming otherwise, would the so-called lost profits continue indefinitely to accrue, barring eviction? See Adams v. Cox, 54 N.M. 256, 221 P.2d 555. This query but indicates the speculative character of any award in this behalf. Furthermore, written notice to vacate five days after January 30, 1950, had been served on that date, seven months prior to judgment. We are satisfied this item of damages should not have been granted.

Likewise, the inclusion of an award of $1000 for damages to north wall of cabin 9, being the south cabin seems to be a duplication of damages and cannot be upheld. In awarding $4500 for restoring two of the cabins, the defendant insists allowance is made for restoring the north wall of cabin 9, the south cabin, being the same as south wall of the middle cabin. The record seems to sustain this claim. At best, the evidence upon which a value for this damage rests is very weak and unsatisfactory consisting wholly of this testimony from the co-plaintiff, Mrs. Snider:

"Q. Have you had any experience in building, Mrs. Snider? A. Quite a lot.

"Q. As an owner? A. Yes.

"Q. And have you built any cabins recently? A. Built two last summer.

"Q. From your experience, what is your estimate as to the amount of damages done to the south cabin? A. I would say around a thousand dollars; you tear that wall out and put a new one in—"

Since, as already stated, the wall for which this damage is claimed served also as the party wall for the cabin adjoining it, in giving damages for restoring the latter, the court necessarily covered the cost of the wall for which damages as a separate item of $1000 were again claimed and mistakenly allowed.

This leaves for further consideration only two awards of damages said to have been erroneously made. One of them, covering several miscellaneous items of personal property, for which no reimbursement was had from insurance coverage consists of a pillow, bedspread, towels, and other articles of small value, representing the difference between $55.79 as allowed, and $34.46, which defendant insists is the most of which there was any proof whatever. Defendant's counsel themselves admit the amount involved in this award is of trifling importance. We agree and dispose of it by applying the old common law maxim, *"lex non curat de minimis."*

As to the item of $444.21 listed as cost of rerouting and repairing the plaintiffs' gas pipe line, it must be placed in the same category with the $1000 item allowed as damages for restoring the north wall of the south cabin. The evidence to

support the lump sum award is as hazy and indefinite as that tendered to support the $1000 award as cost of restoring north wall of south .cabin. But altogether aside from this consideration, we think the claim of defendant that this award is covered by the allowance of $4500 for restoring the two cabins destroyed must be sustained. and the item disallowed.

Thus it is that awards totaling $3044.21 are disallowed reducing the amount for which judgment should have been rendered to the sum of $4595.79. If within the period of 20 days, the time allowed to move for rehearing, the plaintiffs see fit to file with the clerk of this court a remittitur in the sum of $3044.21, the judgment will stand affirmed with costs of appeal to be divided equally between the parties. Otherwise, the judgment will be reversed and the cause remanded with a direction to the trial court to award the defendant a new trial. The costs of appeal will in the latter event be taxed against the plaintiffs.

We cannot close this opinion without stating that counsel for the defendant throughout have exceeded the proper limits of legitimate argument in claims of bias and prejudice on the part of the trial judge without the slightest basis or support in the record for making such charges. No district judge in the state has a finer record for fair and impartial conduct of his judicial office in a conscientious effort to give justice to party litigants in his court and render just and proper judgments under the law, than has the trial judge in this case. It ill behooves counsel in the heat of argument to overstep the proprieties of legitimate argument to the extent here shown. We hope it ·does not occur again and, if it does, more definite notice of the infraction will be in order.

It follows from what has been said that in the event the plaintiffs file within the time limit a remittitur of the amount indicated above, the judgment will stand affirmed with the costs of appeal to be borne equally between the parties; otherwise, the judgment will be reversed and the cause will be remanded to the district court of Grant County with a direction to it to award the defendant a new trial, the cost of appeal to be taxed against the plaintiffs.

It is so ordered.

LUJAN, C. J., and McGHEE, COMPTON and COORS, JJ., concur.